UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

          Plaintiff,

vs

HARANATH POLICHERLA, M.D.,
HARANATH POLICHERLA, M.D., P.C., and
ADVANCED NEURO-REHAB SERVICES, P.C.,

          Defendants.

_____/

# COMPLAINT

State Farm Mutual Automobile Insurance Company ("State Farm"), for its complaint, alleges as follows:

**I.     NATURE OF THE ACTION**

1.     This action seeks to recover money fraudulently obtained from State Farm through the submission of hundreds of bills for neurological evaluations ("Evaluations"), diagnostic tests ("Tests"), and vestibular and physical therapy (collectively, "Therapies") purportedly rendered by Haranath Policherla ("Dr. Policherla") to individuals ("Insureds") who were involved in automobile accidents and eligible for insurance coverage under State Farm's insurance policies.

2.     The Evaluations were part of a pre-determined fraudulent protocol designed by Dr. Policherla to support the purported need for the Tests, and the Tests either were not performed or were performed in a manner to support the diagnosis of serious medical conditions which did not, in fact, exist.  The false diagnoses were then used to support Therapies which

were not medically necessary, if they were performed at all.  Furthermore, the physical therapies were performed, if at all, by individuals who were not licensed physical therapists and were not supervised by licensed physical therapists.  Physical therapy performed by individuals who are not licensed physical therapists or supervised by licensed physical therapists is, by definition, not medically necessary and not reimbursable.

3.      Dr. Policherla's pre-determined protocol was knowingly designed to support fraudulent charges to State Farm and other insurers for medical services that either were never performed or were not medically necessary, and were not designed to benefit the patients.  In fact, patients were: (a) subjected to Evaluations, Tests and Therapies that they did not need, (b) falsely diagnosed with serious medical conditions that they did not have, (c) not properly evaluated and tested for serious medical conditions that they may have had, and (d) not properly treated for any such conditions.

4.      To induce State Farm to pay for the Evaluations, Tests and Therapies, Dr. Policherla submitted, or caused to be submitted, to State Farm fraudulent charges through Haranath Policherla, M.D., P.C. ("Policherla PC") and Advanced Neuro-Rehab Services, P.C. ("Advanced PC").

5.      To support the fraudulent charges, Dr. Policherla submitted, or caused to be submitted, to State Farm through Policherla PC and Advanced PC false reports representing that the Evaluations, Tests and Therapies were medically necessary, false narrative reports regarding the Evaluations, false interpretive reports regarding the results of the Tests, false data supporting the results of the Tests, and false notes purporting to reflect the Therapies sessions.  All of these documents were calculated to and necessary to induce State Farm to pay the fraudulent charges.

6.     At all relevant times, the defendants knew that: (a) the Evaluations, Tests and Therapies were done pursuant to a fraudulent pre-determined protocol designed solely to support fraudulent charges to State Farm and other insurers, (b) the Evaluations, Tests and Therapies either were not medically necessary or were not performed, (c) the Tests were either not performed or were improperly performed in cookie-cutter fashion that was not tailored to the unique needs of each Insured, (d) the cookie-cutter approach to the Tests was designed to inflate the fraudulent charges by purporting to test excessive body parts and nerves, which in turn led to separate charges for each such body part and nerve subjected to the Tests (e) the results of the Tests were manipulated to support findings of serious medical conditions that did not exist, (f) the false findings of serious medical conditions were used to support the purported need for the Therapies, (g) false documents, including false narrative and interpretive reports regarding the Evaluations and Tests, false data sheets purporting to reflect results of the Tests, and false notes purporting to reflect the Therapies sessions, were submitted to State Farm and other insurers, and (h) all of these affirmative acts were done to induce State Farm and other insurers to pay the fraudulent charges, and to create the facade of an "objective manifestation" of injury to satisfy the threshold under Michigan law to bring tort liability claims for non-economic losses, such as pain and suffering, against third parties who were insured by State Farm and other insurers.

7.     This action involves a claim for a declaratory judgment that State Farm does not owe any pending claims from the defendants for Evaluations, Tests and Therapies.  This action also involves claims for common law fraud, as well as under 18 U.S.C. §§ 1962(c) and (d) ("RICO"), to recover actual damages of at least $1,000,000, treble damages and costs, including reasonable attorney's fees.

8.      The defendants' scheme began as early as 2001 and has continued uninterrupted since that time.  As a result of the defendants' scheme, State Farm has incurred damages of more than $1,000,000.

9.      Based upon the defendants' affirmative misrepresentations and acts of concealment which are set forth below, State Farm did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before this Complaint was filed.

## II.      JURISDICTION AND VENUE

10.     Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. § 1961 *et seq.* ("RICO") because they arise under the laws of the United States.  This Court also has jurisdiction over the state law claims because they are so related to the RICO claims as to form part of the same case and controversy.

11.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here.

## III.     PARTIES

### A.      <u>Plaintiff</u>

12.     State Farm Mutual Automobile Insurance Company is a corporation incorporated under the laws of the State of Illinois, with its principal place of business in Bloomington,

Illinois.  It is licensed and engaged in the business of insurance in Michigan and virtually every state.

      **B.**     <u>**Defendants**</u>

      13.     Dr. Policherla resides in and is a citizen of  Michigan.  At all times relevant, Dr. Policherla has been licensed by the State of Michigan to practice medicine, and has submitted, and caused to be submitted, the fraudulent charges at issue through Policherla PC and Advanced PC.

      14.     Policherla PC is a professional services corporation incorporated under the laws of the State of Michigan, with its principal place of business in Grosse Pointe Woods, Michigan. At all relevant times, Policherla PC has operated under the assumed names Pointe Neurology, Pointe Neuroscience Center, Pointe Medical Center, Neuro-Rehab Works and Michigan Center for Sleep Disorders.  As set forth in the chart attached hereto as Exhibit A, Dr. Policherla, through and in conjunction with Policherla PC, submitted thousands of fraudulent bills to State Farm in at least 246 claims .

      15.     Advanced PC is a professional services corporation incorporated under the laws of the State of Michigan, with its principal place of business in Huntington Woods, Michigan. As set forth in the chart attached hereto as Exhibit A, Dr. Policherla, through and in conjunction with Advanced PC, submitted hundreds of fraudulent bills to State Farm in at least 54 claims.

      16.     At all times relevant, Dr. Policherla has been the sole director, officer and shareholder of Policherla PC, and has been the Medical Director and primarily, if not solely, responsible for rendering and supervising the medical services purportedly provided through Advanced PC.  In addition, at least two other individuals render services under the supervision of

Dr. Policherla at both Policherla PC and Advanced PC, and both Policherla PC and Advanced PC submit bills for services purportedly rendered by Dr. Policherla to the same Insureds.

IV.     **ALLEGATIONS COMMON TO ALL COUNTS**

      A.     <u>**First-Party Claims For Payment Under The No-Fault Act**</u>

      17.     Under the Michigan No-Fault Act, insurers are required to pay personal protection insurance benefits, including "allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," when those benefits are causally connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle" (hereinafter "No-Fault Benefits").  MCL §§ 500.3105, 3107(1)(a).

      18.     Insureds can assign their right to No-Fault Benefits to providers of medically necessary services.  Pursuant to such assignments, providers may submit claims directly to insurance companies and receive No-Fault Benefits for these services.

      B.     <u>**Third-Party Tort Claims For Non-Economic Loss Under The No-Fault Act**</u>

      19.     Under the Michigan No-Fault Act, individuals whose injuries arise out of the ownership, operation, maintenance or use of a motor vehicle are permitted to bring tort liability actions against third parties to recover non-economic losses, such as for pain and suffering, only in limited situations, including if the individual has suffered serious impairment of body function.  MCL § 500.3135.

      20.     An individual has suffered serious impairment of body function when his general ability to conduct the course of his normal life has been affected as a result of his injury.  A determination of whether this has occurred requires an analysis of the totality of the

6

circumstances, including; (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, (e) the prognosis for eventual recovery, and (f) whether there is "objective manifestation" of the injury.

21.     The majority of Insureds who have been referred to and purportedly treated by Dr. Policherla were represented by attorneys who frequently represent individuals who bring third-party tort liability claims for non-economic loss.   The attorneys, in turn, have used Dr. Policherla's false diagnoses and related documentation from the Evaluations, Tests and Therapies to establish an "objective manifestation" of serious impairment of body function, which is required to satisfy the threshold for bringing tort liability claims for non-economic loss on behalf of the Insureds and their other clients.  In fact, in many instances, Dr. Policherla's false diagnoses and documentation was the only material evidence used by the attorneys to establish the "objective manifestation" of serious impairment of body function.  Without such false diagnoses and documentation, there was no evidence to support any such finding and the attorneys and Insureds would have been precluded from commencing third-party tort liability claims and recovering non-economic losses.

22.     To illustrate, from at least 2002 through 2006, Dr. Policherla performed Evaluations, Tests and Therapies on at least 41 Insureds represented by attorney Kevin Geer, who frequently represents individuals in third-party tort liability claims for non-economic losses. Each of these 41 individuals were Insureds under State Farm auto insurance policies and/or purported to have third-party tort liability claims for non-economic losses against individuals who were insured under State Farm auto insurance policies.

23.     In the vast majority of these instances, Dr. Policherla purportedly performed Evaluations and Tests which led to a diagnosis of serious medical conditions, including radiculopathies (i.e., pinched nerve roots) on both sides of the spine in both the upper and lower back, as well as vestibular disorders.  Based upon these purported – albeit false – diagnoses, Dr. Policherla determined there was a need for the Therapies.  Dr. Policherla then sought to profit by seeking and recovering reimbursement for the Evaluations, Tests and Therapies from State Farm and other insurers pursuant to assignments of No-Fault Benefits from these individuals.  Simultaneously, the attorneys used the false diagnoses and documentation from Dr. Policherla's Evaluations, Tests and Therapies to establish "objective manifestations" of serious impairment of bodily function which was necessary to satisfy the threshold for bringing tort liability claims for non-economic loss on behalf of those individuals against others insured by State Farm and other insurers.

**C.     The Evaluations**

24.     Insureds are typically referred to Dr. Policherla by either attorneys or chiropractors, and an Evaluation is the first step in Dr. Policherla's pre-determined fraudulent protocol.

25.     In virtually every instance, Dr. Policherla purports to perform an Evaluation and concludes that the Insureds: (a) had pain in both the back and neck, and (b) were dizzy, lightheaded and/or had headaches.  Sample evaluations are attached as Exhibit B.  While it is common for some individuals who have auto accidents to have some of these symptoms, Dr. Policherla's Evaluations typically lead to all of these findings.  Based upon these findings, Dr. Policherla purports to conclude that a battery of diagnostic tests are medically necessary, including the Tests which are described at paragraphs 29-58 below.

26.     As a result of the Tests, Dr. Policherla falsely purports to diagnose: (a) radiculopathies on both sides of the spine in the upper and lower back, which allegedly require physical therapy, and (b) general vestibular disorders that allegedly require vestibular therapy.

27.     In addition to billing for physical therapy and vestibular therapy that is not medically necessary, as described further in paragraphs 59-67 below, Dr. Policherla purports to perform additional periodic Evaluations to support additional Tests and/or ongoing physical and vestibular Therapies.

28.     To maximize the charges for the Evaluations and to exaggerate both the level of service and the seriousness of the Insureds' medical conditions, Dr. Policherla virtually always uses billing codes which falsely represent that the Evaluations required comprehensive histories and examinations, medical decision-making of high complexity, and medical conditions of moderate to high severity.  Those billing codes are Codes 99204, 99205, 99214, 99215, 99244 and 99245 from the American Medical Association's Current Procedural Terminology ("CPT") guide.  Sample bills are attached as Exhibit C, and instances in which Dr. Policherla has used those billing codes are identified in Exhibit A.

**D.     The Medically Unnecessary Tests**

**1.     Electromyography And Nerve Conduction Velocity Tests**

29.     As a result of the Evaluations, Dr. Policherla routinely finds a need to perform two Tests known as needle electromyography tests ("EMGs") and nerve conduction velocity tests ("NCVs").

30.     EMGs and NCVs are forms of electrodiagnostic tests that can be used to diagnose the existence, nature, extent and specific location of nerve abnormalities, including peripheral

nerve injuries (e.g., injuries to the nerves in the arms and legs) and radiculopathies (pinched nerve roots that run along both sides of the spine).

31.     EMGs involve the insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle.  The sound and appearance of the electrical activity in each muscle are compared with well defined norms to identify the existence, nature, extent and specific location of any abnormalities in the muscles, peripheral nerves and nerve roots.

32.     NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents.  The velocity, amplitude and shape of the response are then recorded by electrodes attached to the surface of the skin, and are compared with well-defined normal responses to identify the existence, nature, extent and specific location of any abnormalities in the sensory and motor nerve fibers of peripheral nerves in the arms and legs.

33.     There are many different muscles and nerves in the arms and legs which can be tested with EMGs and NCVs.  The decision of how many limbs and which muscles and nerves to test in each limb should be tailored to each patient's unique circumstances.  In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient as well as the real-time results obtained from the EMGs and NCVs as they are performed on each specific muscle, nerve, and nerve root.  As a result, the number of limbs as well as the nature and number of the muscles, nerves and nerve roots tested through EMGs and NCVs should vary by patient.  As set forth below, with Dr. Policherla they do not.

34.     The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely

to the scientifically-based advancement of neuromuscular medicine, has adopted a Recommended Policy ("Recommended Policy") regarding the optimal use of electrodiagnostic medicine to diagnose various forms of neuropathies, including radiculopathies.  A copy of the Recommended Policy is attached as Exhibit D.  The Recommended Policy also has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

35.     As explained below, the EMGs and NCVs conducted by Dr. Policherla, if they are performed at all, stand in marked contrast to the Recommended Policy.

36.     Although the Recommended Policy appropriately recognizes that EMGs and NCVs have demonstrated usefulness in diagnosing radiculopathies, it explains that the decision of which, if any, of these Tests to perform should be individually tailored to address the unique circumstances of each patient, and that the maximum number of EMGs and NCVs which should be necessary to diagnose a radiculopathy in 90% of all patients is: (a) EMGs of two limbs, (b) NCVs of three motor nerves, and (c) NCVs of two sensory nerves.

37.     The maximums set forth in the Recommended Policy are based on clinical experience spanning decades, and recognize that individuals who suffer radiculopathies virtually always incur those injuries in the nerves or nerve roots in the upper body or in the lower body, and rarely do those injuries occur simultaneously in both the upper and lower body.  Therefore, the Recommended Policy recognizes that in 90% of cases no more than a two-limb EMG should be required to diagnose whether a patient has a radiculopathy.  The two-limb EMGs should be adequate to test either: (a) both legs and the lower back if a radiculopathy is suspected in the

nerves or nerve roots in the legs or lower back, or (b) both arms and the upper back if a radiculopathy is suspected in the nerves or nerve roots of the arms or upper back.

38.     Similarly, and again based upon clinical experience spanning decades, the Recommended Policy recognizes that in 90% of cases no more than three motor nerves and two sensory nerves need to be tested through NCVs to determine whether a patient has a radiculopathy.  These NCVs should be adequate to test either: (a) three motor nerves and two sensory nerves in the arms if a radiculopathy is suspected in the nerves or nerve roots of the arms or upper back, or (b) three motor nerves and two sensory nerves in the legs if a radiculopathy is suspected in the legs or lower back.

39.     In marked contrast to the Recommended Policy and clinical experience regarding radiculopathies, for the vast majority of the Insureds, Dr. Policherla purports to conclude that there is a need to perform EMGs and NCVs on both the arms and upper back as well as the legs and lower back.  As a result of this purported need, Dr. Policherla routinely purports to perform: (a) EMGs of all four limbs (both arms and both legs), (b) NCVs of twelve or more motor nerves, and (c) NCVs of eight or more sensory nerves.  *See* Exhibit A.  This is at least twice the maximum number of EMGs, and four times the number of NCVs, which should be necessary to diagnose a radiculopathy, if there is any such need at all.

40.     Furthermore, Dr. Policherla purports to perform these EMGs and NCVs in a cookie-cutter fashion, without tailoring them to the unique circumstances of each Insured.  This pre-determined protocol is done solely to maximize the charges to State Farm and other insurers because a separate charge is permitted for each nerve tested with NCVs and for each limb tested with EMGs.  Sample bills for NCVs and EMGs are attached as Exhibits E and F, respectively.

Furthermore, as discussed below, he performs the EMGs and NCVs in a manner, if he performs them at all, which produces the same false diagnosis virtually every time. As explained next, the pattern of these diagnoses is statistically impossible, and completely contrary to clinical experience.

41. Specifically, Dr. Policherla diagnosed the vast majority of the Insureds who received EMGs with one or more bilateral radiculopathies. *See* Exhibit A. A bilateral radiculopathy is a pinched nerve root on both sides of the spine at a particular level of the spine. For example, a bilateral radiculopathy at the C6 level of the spine would mean that the nerve roots on both sides of the spine at C6 were pinched. Individuals who are in auto accidents and have radiculopathies typically have them on one side of the spine, but rarely do these radiculopathies occur bilaterally. Therefore, Dr. Policherla's pervasive pattern of diagnosing bilateral radiculopathies is virtually impossible and completely contrary to clinical experience.

42. Furthermore, Dr. Policherla diagnosed many of the Insureds who received EMGs with bilateral radiculopathies at two or more levels of the spine. *See* Exhibit A. As explained above, it is rare for individuals who are in auto accidents to have bilateral radiculopathies at even one level of the spine. It is even rarer for such individuals to have bilateral radiculopathies at two or more levels of the spine. Therefore, Dr. Policherla's pervasive pattern of diagnosing bilateral radiculopathies at two or more levels of the spine is statistically impossible and completely contrary to clinical experience.

43. Furthermore, Dr. Policherla routinely diagnosed Insureds with bilateral radiculopathies at the exact same levels of the spine, namely: (a) bilateral radiculopathies at the C5/C6 levels of the spine, and/or (b) bilateral radiculopathies at the L5/S1 levels of the spine.

*See* Exhibit A.  This pattern of diagnoses is patently absurd.  As explained above, it is extremely rare that any individual would have bilateral radiculopathies at multiple levels of the spine resulting from an auto accident, let alone that those bilateral radiculopathies would occur simultaneously in both the upper back (C5/C6) and lower back (L5/S1).

44.     Even more absurd, Dr. Policherla virtually never diagnoses a radiculopathy at any level of the spine other than C5/C6 or L5/S1.  *See* Exhibit A.  This makes absolutely no sense. For example, although at least 45% of all radiculopathies in the cervical level of the spine occur at C7, of the hundreds of Insureds who Dr. Policherla diagnosed as having a radiculopathy, he diagnosed only three with a C7 level radiculopathy.  *See* Exhibit A.

45.     These diagnoses are remarkable and thoroughly unbelievable because virtually every patient tested by Dr. Policherla has a radiculopathy on both sides of at least one level of the spine, and more often at two levels of the spine. Furthermore, those radiculopathies are always at the exact same levels of the spine.  In other words, very few Insureds are diagnosed as: (a) not having a radiculopathy, (b) having a radiculopathy at any level of the spine other than C5-C6 or L5-S1, or (c) having a radiculopathy on only one side of any level of the spine.  *See* Exhibit A.

46.     Moreover, Dr. Policherla's remarkable and thoroughly unbelievable diagnoses are based upon EMG results that are exactly the same in virtually every patient, which is physiologically impossible.  Specifically, he purportedly performs EMGs on the same muscles in virtually every patient, and obtains exactly the same results from each muscle, which leads to the same diagnosis of radiculopathies on both sides of the spine at either C5-C6 or L5-S1, or at both

14

of those levels of the spine.  *See* representative examples of identical EMG results submitted by Dr. Policherla, which are attached as Exhibit G.

47.     These "objective manifestations" of serious medical conditions-radiculopathies on both sides of the spine, typically at two levels in both the upper and lower back--are then used by attorneys to support tort liability claims for non-economic loss, and by Dr. Policherla, as well as Policherla PC and Advanced PC to support bills to State Farm for physical therapy performed by individuals who are neither licensed to provide physical therapy nor supervised by anyone licensed to provide physical therapy.

## 2.     Evoked Potential Tests

48.     Based upon the Evaluations, Dr. Policherla also routinely finds a need to perform three types of evoked potential tests ("EPs").  *See* Exhibit A.

49.     EPs are non-invasive tests in which either visual nerves, auditory nerves, or peripheral nerves in the arms and legs are repeatedly stimulated.  The "potentials"--brain waves--evoked by this stimulation are then recorded by electrodes attached to the scalp, and compared with established norms to diagnose pathologies in the central nervous system.

50.     In general, visual evoked potentials ("VEPs") assess visual function from the retina to the brain; brainstem auditory evoked potentials ("BAEPs") assess hearing and its pathway through the brainstem; and somatosensory evoked potentials ("SSEPs") assess sensory pathways through the spinal cord and brain.  The studies, although helpful in rare situations, are non-specific in that they do not diagnose the nature, extent or specific location of any abnormality.

51.     In the modern day, it would be extremely unusual to perform the full battery of evoked potentials (visual, brainstem auditory and somatosensory).  Before MRI testing became

available in the 1980s, the evoked potentials were often done when assessing patients for possible multiple sclerosis.  As MRI is very sensitive for multiple sclerosis, these studies are now seldom done.

52.    Despite the limited circumstances in which EPs could be legitimate, Dr. Policherla often concludes as a result of the Evaluations that it is medically necessary to perform all three types of EPs – VEPs, BAEPs, and SSEPs.  *See* Exhibit A.  Dr. Policherla, however, does not provide any reason to suspect that the Insureds have conditions that could be diagnosed by EPs, nor does he identify any diagnosis achieved as a result of the EPs after they are allegedly completed.

53.    The EPs, therefore, were not medically necessary and did not generate any results that could assist in the diagnosis of the Insureds.

**3.      Electronystagmography Tests**

54.    Based upon the Evaluations, Dr. Policherla also frequently finds a purported need to test the Insureds' vestibular functioning by performing electronystagmography tests ("ENGs").  *See* Exhibit A.

55.    ENGs are diagnostic tests  in which measurements of eye movement are used to assess vestibular function in patients with dizziness and balance disorders.   They are performed by either: (a) attaching electrodes around the eye and measuring the movements of the eye in relation to the electrode; or (b) tracking and measuring movements of the pupil with a small video camera set in a swim-goggle type frame.  There are typically three subparts of the ENGs (oculomotor evaluation, positional testing, and caloric stimulation), and the results from these three subparts can assist in determining whether a vestibular disorder exists and whether it is central or peripheral.

56.     Dr. Policherla routinely performs the ENGs without regard to the specifics of a patient's history or examination, and in a manner which produces the same findings virtually every time as part of his pre-determined protocol to support the purported need for vestibular therapy.

57.     Indeed, for virtually every Insured who receives an ENG, Dr. Policherla finds abnormalities that purportedly are consistent with both central vestibular pathology and peripheral vestibular pathology on both the left and right sides.  Notably, a finding of central vestibular pathology suggests damage to the parts of the brain that process vestibular information, yet there is no evidence in the patients' histories or examinations to support this finding.  Dr. Policherla's findings of central and peripheral vestibular pathologies often either are based upon: (a) his findings that the results of certain aspects of the ENG are abnormal when, in fact, the results are normal even by his own criteria, and/or (b) his findings that the results of certain aspects of the ENGs are abnormal when, in fact, those results are based upon inaccurate and invalid data and waveforms produced through improper testing procedures.  See Exhibit H for samples of ENG results that were normal but were interpreted by Dr. Policherla as abnormal, and Exhibit I for samples of ENG results which were abnormal but were based upon inaccurate and invalid data and waveforms produced through improper testing procedures.

58.     If an individual has a central or peripheral vestibular pathology, physicians should attempt to diagnose the condition or injury causing those pathologies.  This is necessary in order to arrive at a treatment plan that will address the underlying cause of the pathologies.  Yet, Dr. Policherla makes no effort to diagnose the condition or injury that may be creating the purported central and peripheral vestibular pathologies.  Instead, he simply uses his purported

17

findings of pathologies as a basis to order two forms of medically unnecessary vestibular therapy which are described in the next section of this complaint, Central Vestibular Therapy and Epley Maneuvers.   Indeed, as described below, the Defendants have charged State Farm for these medically unnecessary vestibular therapies over 6,000 times.

       **E.**    **The Improper Therapy**

     59.    After Dr. Policherla makes false findings and/or falsely diagnoses the Insureds as described above, Defendants charge State Farm for two types of therapy – vestibular therapy allegedly designed to eradicate dizziness and problems with balance, and physical therapy allegedly designed to treat the radiculopathies.

     60.    Defendants charged State Farm for vestibular therapy over 6,000 times, allegedly performing this type of therapy on virtually every Insured.

     61.    Defendants frequently created one handwritten set of notes allegedly documenting the need for and administration of vestibular therapy, then copied those notes and inserted them in other files, changing only the patient name and date at the top and therapist's signature at the bottom.   Sample duplicate notes are attached as Exhibit J.   There is, therefore, no legitimate documentation of the initial or ongoing medical necessity of the vestibular therapy, much less any evaluation of whether the therapy ever improved the condition of any Insured.

     62.    Defendants also routinely billed State Farm for the performance of medically unnecessary Epley Maneuvers on both the left and right sides.   *See* Exhibit A.   An Epley Maneuver is a therapeutic procedure used to treat only one particular diagnosis, benign paroxysmal positional vertigo ("BPPV"), which is a specific type of dizziness caused by miscroscopic otoconia or stones (composed mostly of calcium carbonate) that have worked their way into the semicircular canals of the ear and stimulate the balance nerve inappropriately.   If a

patient is experiencing dizziness for any reason other than the presence of these miscroscopic stones (i.e., BPPV), the Epley Maneuver is of no value whatsoever.

63.   To support his orders for Epley Maneuvers of the Insureds, Dr. Policherla performs the Dix-Hallpike Test as part of the ENGs.  To perform the Dix-Hallpike Test, the patient is brought from a sitting to supine position with his or her head turned 45 degrees to one side, eye movement is observed for nystagmus (involuntary eye movement) and recorded with the ENG, the patient is returned to a sitting position, and the test is repeated on the other side. For virtually every Insured who receives a Dix-Hallpike Test, Dr. Policherla makes a false finding that the results are abnormal and, on that basis, orders Epley Maneuvers for the Insureds. These abnormal findings are false because the Dix-Hallpike Test results are actually normal, and therefore none of the Epley Maneuvers are of any value whatsoever.  *See* Exhibit H for samples of reports in which Dr. Policherla finds the Dix-Hallpike Test results are abnormal even though the results are actually normal.

64.   Furthermore, to maximize the fraudulent charges for the medically unnecessary Epley Maneuvers, Dr. Policherla typically: (a) requires each Insured to receive Epley Maneuvers on both the right and left sides on two separate visits, each of which generates a separate charge, and (b) records the Epley Maneuvers with an ENG which is not medically necessary but which leads to an additional charge.  Sample reports and bills are attached as Exhibit K.  Moreover, the ENGs performed in conjunction with Epley Maneuvers consistently show that the Insured did not have BPPV, and that therefore, the Epley Maneuvers were not medically unnecessary.

65.   For the reasons set forth above, the vestibular therapy was not medically necessary, but rather was designed solely to increase the fraudulent charges to State Farm.

66.     Defendants also charged State Farm for physical therapy over 4,000 times, but did not employ a single licensed physical therapist.  Michigan law forbids the practice of physical therapy without a license.  See MCL § 333.17820.  Physical therapy performed by an unlicensed individual, if it was performed at all, is by definition not medically necessary.

67.     State Farm, therefore, was and is not lawfully obligated to pay for any of the Therapies billed by defendants.

**G.     State Farm's Justifiable Reliance**

68.     Defendants attested to the medical necessity of the Evaluations, Tests and Therapies, as well as the validity of the charges, and they are obligated legally and ethically to act honestly and with integrity.

69.     State Farm is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents submitted to State Farm in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm to justifiably rely on them.  As a result, State Farm has incurred damages of more than $1,000,000 based upon the fraudulent charges.

70.     Based upon the defendants' material misrepresentations and other affirmative acts to conceal their fraud from State Farm, State Farm did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before it filed this complaint.

## V.      CAUSES OF ACTION

### First Cause of Action Against Policherla PC and Advanced PC
(Under 28 U.S.C. § 2201)

71.      State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 70 above.

72.      There is an actual case and controversy between State Farm and Policherla PC and Advanced PC as to all charges for the Evaluations, Tests and Therapies that have not been paid.  State Farm contends that the defendants are not entitled to coverage for No-Fault Benefits for any of these charges.

73.      Because the defendants have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim that Policherla PC and Advanced PC have submitted to State Farm, they are not entitled to any coverage for No-Fault Benefits for any of the Evaluations, Tests or Therapies at issue.

74.      Accordingly, State Farm seeks a judgment declaring that Policherla PC and Advanced PC are not entitled to collect No-Fault Benefits for any of the unpaid charges for the Evaluations, Tests or Therapies, as well as any other relief the Court deems just and proper.

### Second Cause of Action Against All Defendants
(Violation of 18 U.S.C. 1962(c))

75.      State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 70 above.

76.      Dr. Policherla, Policherla PC and Advanced PC are an association-in-fact "enterprise" ("the Fraudulent Billing Enterprise") as that term is defined in 18 U.S.C. §1961(4),

that engages in, and the activities of which affect, interstate commerce.  The members of the Fraudulent Billing Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Dr. Policherla falsely diagnoses Insureds with serious medical conditions (i.e., bilateral, multi-level radiculopathies, and vestibular disorders) based upon a pre-determined protocol of Evaluations and Tests that either were not medically necessary or were not performed, and falsely purports to provide Therapies which were not medically necessary or were not performed.  Dr. Policherla did so to support fraudulent charges for these services, and to curry favor with his attorney referral sources to establish "objective manifestation" of serious impairment of body function which is necessary to support tort liability claims for non-economic loss.  To support the fraudulent diagnoses, Dr. Policherla created false documentation from the Evaluations, Tests and Therapies, including false findings of symptoms in the Evaluation reports, false and physiologically impossible data from the Tests, false interpretive reports diagnosing serious medical conditions from the Tests, and photocopied therapy notes.  Policherla PC and Advanced PC then used these false diagnoses and documents to support fraudulent charges to State Farm and other insurers.  Although Policherla PC and Advanced PC have the facade of being independent entities with different names, addresses and taxpayer identification numbers, they are not.  In fact, Policherla PC and Advanced PC share employees and patients, and virtually all of their fraudulent charges to State Farm and other insurers have been based upon services purportedly provided, or supervised by Dr. Policherla, including fraudulent charges for the Evaluations, Tests and Therapies.  Dr. Policherla has used these seemingly independent

entities as the vehicles to accomplish a common purpose, namely the submission of fraudulent charges to State Farm and other insurance companies for Evaluations, Tests and Therapies that either were not medically necessary or were not performed at all.

77.     As set forth in paragraphs 13-16 and 76 above, Dr. Policherla, Policherla PC and Advanced PC are employed by and associated with the Fraudulent Billing Enterprise.

78.     Dr. Policherla, Policherla PC and Advanced PC have knowingly conducted and/or participated, directly or indirectly, in the conduct of the Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit to State Farm and other insurers hundreds of fraudulent bills for the Evaluations, Tests and Therapies which were medically unnecessary or were not performed.  The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in Exhibit A attached hereto.

79.     State Farm has been injured in its business and property by reason of defendants' above-described conduct in that it has paid more than $1,000,000 based upon the fraudulent charges.

80.     By reason of this injury, State Farm is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### Third Cause of Action Against All Defendants
(Violation of 18 U.S.C. 1962(d))

81.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 70 above.

82.     The Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit to State Farm and other insurers hundreds of fraudulent bills for the Evaluations, Tests and Therapies which were medically unnecessary or were not performed.  The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in Exhibit A attached hereto.

83.     Each defendant knew of, agreed to and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission to State Farm and other insurance companies of fraudulent bills for the Evaluations, Tests and Therapies which were medically unnecessary or were not performed.

84.     State Farm has been injured in its business and property by reason of defendants' above-described conduct in that it has paid more than $1,000,000 based upon the fraudulent charges.

85.     By reason of this injury, State Farm is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d), and any other relief the Court deems just and proper.

**Fourth Cause of Action against All Defendants**
(Common Law Fraud)

86.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 70 above.

87.     The defendants Dr. Policherla, Policherla PC and Advanced PC intentionally and knowingly made false and fraudulent statements of material fact to State Farm by submitting, and causing to be submitted, hundreds of fraudulent bills which included charges for the performance and interpretation of Evaluations, Tests and Therapies that were medically unnecessary or not performed.

88.     The false and fraudulent statements of material fact include the representations in every claim that the Evaluations, Tests and Therapies were performed, were performed properly, and were medically necessary when, in fact, they were not, and that the diagnoses of radiculopathies and vestibular disorders were valid when, in fact, they were not, and that the physical therapy was performed by licensed physical therapists when, in fact, it was not.  The date, the nature of the misrepresentations and the identity of the parties who made and caused these misrepresentations to be made in each and every claim are identified in the chart attached hereto as Exhibit A.

89.     The defendants made these false and fraudulent statements to induce State Farm to pay charges for the performance and interpretation of the Evaluations, Tests and Therapies which were not compensable under the No-Fault Laws.

90.     State Farm justifiably relied on the defendants' false and fraudulent representations, and as a proximate result have incurred damages of more than $1,000,000 based upon the fraudulent charges.

25

91.     The defendants' extensive fraudulent conduct entitles State Farm to recover exemplary damages.

92.     Accordingly, by virtue of the foregoing, State Farm is entitled to compensatory and exemplary damages, together with interest and costs, and any other relief the Court deems just and proper.

WHEREFORE, State Farm demands that a Judgment be entered in its favor:

(a)     on its First Cause of Action, declaring that neither Policherla PC nor Advanced PC has any right to receive payment for any pending bills for the Evaluations, Tests or Therapies;

(b)     on its Second Cause of Action against all defendants, for compensatory damages in an amount of more than $1,000,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

(c)     on its Third Cause of Action against all defendants, for compensatory damages in an amount of more than $1,000,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d) plus interest;

(d)     on its Fourth Cause of Action against all defendants, for more than $1,000,000 in compensatory damages, plus exemplary damages in an amount to be determined at trial and interest; and

(e)     awarding State Farm its costs including reasonable attorneys' fees, and any other relief the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm demands a trial by jury.

Respectfully submitted,


By:___/s/ Morley Witus_____
    One of the Attorneys for State Farm
    Mutual Automobile Insurance Company
    Morley Witus (P30895)
    BARRIS, SOTT, DENN & DRIKER, P.L.L.C.
    211 W. Fort Street
    15th Floor
    Detroit, MI  48226-3281
    (313) 965-9725

    Ross O. Silverman
    Jenny Louise Johnson
    Kathy P. Josephson
    KATTEN MUCHIN ROSENMAN LLP
    525 West Monroe Street
    Chicago, IL  60661-3693
    (312) 902-5200


Dated:  September 11, 2008


::ODMA\PCDOCS\DOCS\362704\1